Paul Hoffman SBN 71244
John Washington SBN 315991
Karen Kartun SBN 357230
Schonbrun Seplow Harris Hoffman & Zeldes, LLP
200 Pier Ave. Ste. 226
Hermosa Beach, California 90254
Phone: 310-717-7373
Emails: hoffpaul@aol.com; jwashington@sshhzlaw.com;
kkartun@hoffmanwashington.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VICTORIA FLORES, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>CHAD BIANCO, Sheriff Riverside County, DON SHARP, Undersheriff, HERMAN LOPEZ, Assistant Sheriff Corrections, COUNTY of RIVERSIDE, and DOES 1-10, inclusive,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR DAMAGES**<br><br>Retaliation in Violation of the Federal False Claims Act, 31 U.S.C. § 3730(h);<br><br>Retaliation in Violation of California False Claims Act, Cal. Gov't Code § 12653;<br><br>Wrongful Termination (Whistleblower Retaliation) in Violation of Cal. Labor Code § 1102.5;<br><br>Wrongful Termination and Retaliation in Violation of Public Policy;<br><br>Gender Discrimination in Violation of the Fair Employment & Housing Act, Cal. Gov't Code § 12940(a);<br><br>Conspiracy to Interfere with Civil Rights, 42 U.S.C. § 1985;<br><br>Violation of Civil Rights 42 U.S.C. § 1983 (Fourteenth Amendment Due |

Process)

Violation of Civil Rights 42 U.S.C. §
1983 (Monell)

**DEMAND FOR JURY TRIAL**

1

## __INTRODUCTION__

2    1.    This action arises from the wrongful and retaliatory termination of

3  Victoria Flores, a highly respected and principled Sheriff's Captain with an

4  unblemished record of integrity and professionalism over her decades of service to

5  the Riverside County Sheriff's Office.  Flores's unwavering commitment to honesty

6  and accountability made her a target in a department plagued by corruption,

7  unconstitutional conduct, and gender discrimination.

8    2.    Sheriff Chad Bianco and his leadership team sought to silence and

9  discredit Captain Flores. Bianco used a minor incident at the shooting range as

10  pretext for terminating Captain Flores to shield the department from scrutiny.

11  Bianco intentionally stigmatized Captain Flores and impaired her reputation for

12  honesty and morality, causing her great emotional harm and hindering her future

13  employment opportunities.  In holding Defendants accountable for their unlawful

14  actions, Plaintiff seeks full legal and equitable relief.

15

## __JURISDICTION AND VENUE__

16    3.    This Court has subject matter jurisdiction over this action pursuant to

17  28 U.S.C. § 1331 and 31 U.S.C. § 3732(a) and (b), as the claims arise under the

18  Federal False Claims Act, 31 U.S.C. §§ 3729 and 3730(h), Title VII of the Civil

19  Rights Act of 1964, 42 U.S.C. §§ 1983 and 1985.

20    4.    Pursuant to 28 U.S.C. §1367 this Court has supplemental jurisdiction

21  over the state law claims arising under the California False Claims Acts  (Cal. Gov't

22  Code § 12653), Section 1102.5 of the California Labor Code, and California's Fair

23  Employment and Housing Act (Cal. Gov't § 12653), and Wrongful Termination and

24  Retaliation in Violation of Public Policy because those claims are so related to the

25  claims within this Court's original jurisdiction that they form the same case or

26  controversy under Article III of the United States Constitution

27    5.    Venue is proper in this district because Defendants reside in the district,

28  maintain a principal place of business in the district, and a substantial part of the

1  events or omissions giving rise to Plaintiff's claims occurred inside the district.

2  **PARTIES**

3      6.      Plaintiff FLORES ("Flores" or "Plaintiff"), at all relevant times, was an

4  employee with Riverside County Sheriff's Office ("RCSO").  She began her career

5  with the RCSO in 1996 and served the RCSO with pride and integrity for twenty-

6  eight years.  Through her hard work and dedication to service, Flores overcame

7  multiple roadblocks to move up the ranks in the RCSO from her beginnings as a

8  Correctional Deputy through positions as Corporal, Sergeant, Lieutenant, and finally

9  achieving the status of Correctional Captain at the Robert Presley Detention Center

10  a position of great responsibility, which she held until the time she was

11  inappropriately terminated.  Over the course of her career, Flores managed large

12  departmental projects, chaired several committees, and was widely regarded by her

13  colleagues as a consummate and tireless professional.

14      7.      Defendant CHAD BIANCO ("Defendant Bianco") was at all times

15  relevant to the litigation, a policymaker and/or supervisor and acting under color of

16  law within the course and scope of his employment and office as the Sheriff of the

17  Riverside County Sheriff's Office.  Defendant Bianco has served as Sheriff since

18  2019.  He oversees more than 3600 employees and five correctional facilities.

19  Under his leadership, the department has experienced multiple scandals, including

20  the Riverside County correctional facilities becoming the deadliest jail system in the

21  nation, which led to an ongoing investigation by the California Department of

22  Justice.  He is being sued individually and in his official capacity.

23      8.      Defendant DON SHARP ("Defendant Sharp") was at all times relevant

24  to the litigation acting under color of law within the course and scope of his

25  employment and offices as a law enforcement officer of the RCSO. As Undersheriff,

26  Defendant Sharp served as the second in command within the Sheriff's Office.  He

27  is being sued individually and in his official capacity.

28      9.      Defendant HERMAN LOPEZ ("Defendant Lopez") was at all times

relevant to the litigation acting under color of law within the course and scope of his employment and offices as a law enforcement officer of the RCSO.  As Assistant Sheriff of Corrections, Defendant Lopez oversaw the management and operations of the county's jail system.

10.     Defendant COUNTY OF RIVERSIDE ("Defendant County") is a duly constituted governmental entity in the State of California and is, or was, the employer of all individually named Defendants, including but not limited to those who are sued in their individual and official capacities, as well as one, or all Defendant DOES 1 through 10.

11.     The identities, capacities, and/or nature of involvement of Defendant DOES 1 through 10 ("Doe Defendants") are presently unknown to Plaintiff. Plaintiff, therefore, sues such persons using "Does" as fictitiously-named defendants.  Plaintiff is informed, believes, and thereupon alleges that there is likely to be evidentiary support to prove that each Doe Defendant was involved in some manner and legally responsible for the acts, omissions, and/or breaches of duty alleged below.  Plaintiff will amend the Complaint to name the Doe Defendants upon learning their true identities and roles in the actions complained of herein.

## FACTS APPLICABLE TO ALL CAUSES OF ACTION

12.     Plaintiff Flores began her employment with the RCSO on April 11, 1996.  Throughout over twenty-eight years of employment with the RCSO, Plaintiff rose through the department ranks, consistently received excellent reviews of her work, and had a reputation for honesty and integrity.  Before the episode flagged as the reason for her termination, she had never been subject to any disciplinary actions.  Plaintiff experienced gender discrimination, which affected the rate at which she was promoted, and retaliation in the form of termination for being unwilling to stay silent or cover up the corruption and unconstitutional practices she witnessed.

*Retaliation for Challenging Unconstitutional Actions*

13.     In May 2021, while a Correctional Lieutenant, Plaintiff became aware of an incident at the Robert Presley Detention Center involving excessive use of force against an inmate, which resulted in the inmate suffering a head injury and loss of memory.  Plaintiff was shown video of the incident by one of the sergeants. She appropriately reported the incident to her superior officer, and the incident was subsequently investigated by the Professional Standards Bureau ("PSB").  While the investigation was underway, Lieutenant Flores was promoted to the Captain of the Robert Presley Detention Center in July 2021.  When the investigation was complete some months later Captain Flores noted the deputies received no disciplinary action. Flores spoke to Captain Kenneth Paulson of the PSB to ask why no discipline was issued.  In response, Paulson downplayed the entire incident, explaining that there was no issue because the inmate had no recollection of the events.  Captain Flores posed a hypothetical question to Captain Paulson on what would have happened if the inmate would have died and Captain Paulson responded flippantly, "Well, then we would have done a homicide investigation."

14.     Similar incidents continued to occur at the detention facility.  It was well known by her staff that she would not tolerate the use of unconstitutional excessive force.  Concerned about reports of inmate mistreatment and deaths, the Riverside County Grand Jury evaluated conditions in the county jails and prisons beginning in 2021. Plaintiff met with the Grand Jury for a question-and-answer session in August 2021, shortly after achieving her new position and was transparent about all practices concerning the administration of the jails.  She received a letter of commendation from one of the members of the Grand Jury for her forthrightness in answering their questions.

15.     When the Grand Jury reconvened in March 2022 and requested another question-and-answer session regarding inmate deaths, Defendant Bianco, concerned Plaintiff would testify honestly about these incidents, ordered Plaintiff to say she

was sick so she could not appear.  Unwilling to lie but concerned about repercussions from disobeying Bianco, Plaintiff said she would instead take a vacation day that day.

16.     While in her leadership position at the detention facility, Plaintiff quickly reported any issues to the PSB, and her direct Chief, including another severe incident that occurred in May 2023.  The incident involved a deputy with a history of disciplinary issues. Plaintiff reported the deputy to the PSB, and Chief James Krachmer, and he was placed on administrative a month after the incident. However, as soon as Plaintiff was placed on administrative leave, the deputy was brought back to active service without receiving any discipline.

17.     In August 2023, an inmate suffered a fentanyl overdose and required hospitalization.  Flores immediately informed her superior officer, Correctional Chief Misha Graves. Captain Flores explained to Graves that the inmate in question could possibly pass away.  Chief Graves told Plaintiff she did not want to have another death listed for corrections.  Graves told Flores not to send her the Notification of Incident ("NOI"), which would have been the usual protocol. Instead, she stated she would have the inmate federally released from custody while he was in the hospital, which would remove him from the list of incarcerated individuals and distance Graves from any responsibility.  The federal release process is only supposed to be used when a detention facility reaches 90% capacity, which was not case at the time.  Recognizing the inmate's release was atypical, Plaintiff sent the NOI to herself for documentation.

18.     Additionally, the Robert Presley Detention Center houses many severely mentally ill inmates.  Because their illness made them unable to either understand or comply with requests, these inmates frequently responded violently toward the deputies.  The Use of Force investigation team ("CAPO") began pushing for criminal charges to be filed against these inmates so that they could use those charges to argue against any inmates who filed civil excessive force suits against the

RCSO.  Plaintiff pushed back against this plan because it would ultimately keep the inmates in custody longer and delay or entirely prevent their getting treatment for their illness.  Flores spoke out against this practice in October 2023.  Instead of addressing the issue, three weeks later leadership once again reacted by moving all the facility commanders around.  Plaintiff understood that this was part of the leadership's "fuck around and find out" treatment for individuals who voiced their concerns about leadership's actions.

19.    Similar occurrences continued at other Riverside County correctional facilities in which inmates died or were seriously injured, and disciplinary action was not taken against the perpetrators.  The Sheriff's Office covered up or hid information about these incidents from the relatives of the deceased inmates.  The severity of these incidents was such that the Department of Justice initiated a civil rights investigation of the Sheriff's Office that is still ongoing.  A motivating factor in Plaintiff's termination was Plaintiff's opposition to Defendants' illegal actions and egregious conduct and fear that she would expose them.

20.    Plaintiff's concerns about potential retaliation from leadership were heightened when, after the incident with Chief Graves, she found a representative from the technical services bureau in her office altering her computer.  The representative's claim that it was to enable Plaintiff to make Amazon purchases for her facility was nonsensical as purchases of that type were handled by someone else.  Suspicious about the real reason for the representative's action, Plaintiff examined her computer settings and found that a second IP address was now associated with her system, suggesting her computer was being mirrored and monitored elsewhere.

21.    Plaintiff was terminated in part because Defendant Bianco knew Plaintiff recognized and would expose the egregious wrongs occurring in the jails.

*Retaliation for Challenging Corruption-Overcharges*

22.    Beginning in July 2021, Plaintiff noted improper charges in the budget she was responsible for overseeing.  These included charges for consultations she

was unaware of and wildly inflated charges for construction and repair work.

23.     In September 2021, the manager of the security electronics company CML contacted Plaintiff.  Plaintiff had developed a relationship with the vendor while working out contracts and hiring vendors before her July 2021 promotion to captain.  The manager informed Plaintiff that Assistant Sheriff Robert Gunzel was bringing over people from Orange County and having the contractors markedly inflate the contract prices.

24.     Shortly after this interaction, a sergeant working within the Project Management Office ("PMO") approached Flores with concerns that Assistant Sheriff Robert Gunzel was bringing his friends from Orange County over as part of the Job Order Contracting ("JOC") program.  He explained that of the nine JOC contractors hired, only two were not from Orange County and, the ones from Orange County had a personal relationship with Gunzel.  This sergeant also expressed his concern that Remon Tadrous, the director of the PMO, told his staff that he did not want any facility commanders receiving line item costs for projects and to provide only the total amount to avoid raising too many questions.  At the time of these conversations, Plaintiff was still on probation in her new position and worried about the repercussions of reporting the malfeasance.  Plaintiff encouraged the manager to go to the auditing company and seek an investigation and told the sergeant he should let his chain of command know.

25.     In May 2022, Lieutenant Rafael Gomez, who had some construction experience, compiled a spreadsheet of department construction expenses and noticed discrepancies amounting to hundreds of thousands of dollars.  Gomez contacted the vendors for clarification, but the vendors refused to supply any documentation.  Gomez sent the information up the chain of command, but nothing was done about it.

26.     Plaintiff, along with other concerned colleagues, appropriately questioned these charges.  Instead of receiving an appropriate response from the

leadership, Plaintiff was told to stop challenging the charges.  When Plaintiff questioned Chief Graves about a "consultation" fee for more than 60,000 dollars, Plaintiff was told "It is what it is," and received no further information.

27.    Commanders had previously been able to see and question all line items for their projects, but RCSO leadership stopped that when Plaintiff and her colleagues raised concerns about the inflated or unexplained charges.  Plaintiff received an email from her Chief stating that Remon Tadrous, the director of the Project Management Office, would no longer be providing the information.  From then on, Plaintiff was only informed of the total project cost and was denied information about the component costs.  Additionally, Bianco had Gomez transferred and specifically ordered someone without construction experience to be put into the position.  Gomez was told he was being transferred because he had been asking too many questions.

28.    Plaintiff was terminated in part to stop her questions and prevent her from exposing these overcharges.

*Retaliation for Challenging Corruption Cover Ups for Leadership's Friends*

29.    In May 2023, there was a homicide investigation in Riverside County involving the killing of a young woman by her boyfriend.  The homicide investigator submitted the case to the Riverside District Attorney for prosecution. Without discussing it with the homicide investigator or the victim's family and in conflict with his obligations as a law enforcement officer, Assistant Chief Delgado wrote to the DA and asked him to be lenient with the perpetrator, who was a family friend.  He also advocated for the perpetrator's expedited release from Plaintiff's facility.  Based on Delgado's letter, and without the input or consent of the homicide investigator, the DA lowered the charges from murder to involuntary manslaughter. When the homicide investigator became aware of the back-channel actions and change in the charges, he demanded an investigation.  The PSB came to Plaintiff's facility to investigate the charges and spoke with one of Plaintiff's lieutenants.

Knowing the underhanded actions would anger Plaintiff, the PSB personnel told the lieutenant not to let his superior officer, Captain Flores, know what had happened. Uncomfortable with the subterfuge, the lieutenant informed Plaintiff of what occurred. Initially, Delgado suffered no consequences. Delgado was forced to resign only after the information got out and was met with public outrage.

30.    In November 2023, a sergeant came to Plaintiff with information that one of the Perris station sergeants was participating in pornography for payment. Plaintiff knew the department had previously placed another correctional lieutenant on administrative leave for making a racial joke while participating in a non-pornographic TikTok video. Recognizing that the Perris station sergeant's pornographic video was significantly more offensive than that created by the other correctional lieutenant, Plaintiff brought the information to Chief Misha Graves. Graves made it clear she was displeased that Plaintiff raised a concern. Although Graves asked Plaintiff to send whatever information she had, it ultimately became clear to Plaintiff that the sergeant's pornographic activities were already known to the department for a year. Instead of being reprimanded, like the other correctional lieutenant, the involved sergeant had simply been told to keep it on the "down low."

31.    Two weeks after bringing the information to Graves, Plaintiff was placed on administrative leave. By discharging Plaintiff, the department had, in effect, resolved the complaint because, without a complainant, there was no requirement to investigate. The matter was dropped, and there were no repercussions for the video participant.

*Favors for Bianco's Political Supporters*

32.    In July 2023, a friend and political supporter of Defendant Bianco's, who was the proprietor of a company called "One Day Wraps," was awarded a lucrative contract to wrap several buses before any other business was even allowed to bid on the contract.

33.    After One Day Wraps had already completed the work, one of

Plaintiff's lieutenants, Lieutenant Rafael Gomez, was told by Chief Zach Hall to justify the contract by finding three other quotes from other vendors that were higher than the amount paid to One Day Wraps. The lieutenant could only do so by seeking vendors outside Riverside County. Plaintiff was not informed of the lieutenant's assignment until after the lieutenant had already completed the task.

34.     Plaintiff was intentionally kept uninformed because Defendant Bianco knew she would have challenged the improper conduct.

*Firing Range Incident*

35.     On November 27, 2023, Plaintiff received a call from Chief Graves stating she was being moved from the Robert Presley Detention Center to the Smith Correctional Facility. Other correctional commanders were also to be moved between facilities.

36.     On November 28, 2023, Plaintiff, along with other correctional commanders, met with Assistant Sheriff Lopez to inform him that the commanders did not want to be relocated. The commanders wanted to speak with Defendant Bianco, as they believed the transfers were in retaliation for their speaking up about leadership's resistance to their filing charges in use of force incidents. Furthermore, the commanders recognized that by relocating them to different facilities, leadership aimed to prevent them from answering questions during the upcoming DOJ investigation into previous jail incidents because they would lack knowledge of past incidents that had occurred in facilities to which they would be assigned. No meeting with Bianco was permitted.

37.     November 29, 2023, was Plaintiff's first day back in the office after having been off for several days. There was a large stack of paperwork on her desk that needed to be addressed, particularly with the impending transfer. Additionally, Plaintiff wanted to arrange for two of her command staff members to move to the new facility with her and needed to make phone calls to accomplish this. Plaintiff received a text message from Correctional Lieutenant Gomez the day before

reminding her and others that they were scheduled to do a qualification on November 29th.  The message did not state whether it was a daytime or nighttime qualification. Plaintiff felt there was no time to do the qualification that day with everything else she needed to accomplish, but her team convinced her to go to the range for the qualification.

38.    At the range, Plaintiff had on a new ballistic vest that she had never worn before.  The vest was too large for her torso, and after shooting, she had difficulty figuring out how to holster her gun appropriately with the vest on. Sergeant Kelly, the Rangemaster, gave her commands to assist her in this process. As he was doing so, Plaintiff heard Deputy Beltran yell, "You, you, come here!" something a deputy would never do to a much higher ranking officer like Plaintiff. Indeed, Beltran contemptuously pointed to the ground in front of him, essentially summoning Plaintiff over to him as one might call a dog.  Standard procedure would have required Beltran to inform Rangemaster Kelly about any concerns he had so that Kelly could address those concerns with Plaintiff.

39.    Unaware of why Beltran called her over, Plaintiff assumed that it was related to her being outspoken about the many issues she had raised and that perhaps she was about to be terminated, or that someone had died at her facility.  She was focused on these concerns and, therefore, confused and taken aback when Beltran stated he called her over because she was being unsafe with her weapon when she was trying to holster it.  Plaintiff was confused by Beltran's aggressive attitude, which was far beyond that called for based on the severity of the claimed offense. Standard protocol would have been for Beltran to speak to Rangemaster Kelly about his concerns and have Kelly address them with Plaintiff since Kelly was already dealing with the difficulty with holstering the gun.

40.    After Plaintiff walked back to the bay where her team stood, she overheard a conversation between the rangemaster in the adjacent bay and Sergeant Kelly in which Kelly stated that an email was going out the following week noting

that the qualifications were night qualifications.  Plaintiff had not realized the qualification was supposed to be a nighttime qualification until that time.  Plaintiff asked Sergeant Kelly, "Are we all right qualifying today?"  Sergeant Kelly looked at the conditions and said it was fine because it was overcast.

41.     Embarrassed and rattled by the humiliating treatment she received in front of her team, Plaintiff wanted to leave the range as quickly as possible and regain her composure.  As Plaintiff was leaving, she approached Kelly to say goodbye.  She did not ask Sergeant Kelly to speak with Beltran, but having witnessed Beltran's unprofessional conduct toward Plaintiff, Kelly called Beltran over of his own accord. Beltran and Kelly proceeded to get into an argument over what just happened.

42.     When Plaintiff witnessed Beltran also being disrespectful towards Kelly, his superior officer, she told Beltran his behavior was inappropriate.  However, because Plaintiff strongly believes in leaving any interaction on a positive note, she told Beltran that she had heard very good things about him, and she looked forward to working with him at the Smith facility.  Furthermore, as she was leaving, Plaintiff asked Kelly to check on Beltran and ensure he was OK.  In the investigation that followed the incident, Beltran misconstrued Plaintiff's act of good faith as an attempt to intimidate him.

43.     Plaintiff, as per usual practice, did not fill out the qualification time on the paperwork. Sergeant Kelly completed the paperwork.  Plaintiff left the range without recognizing Kelly falsified the time.

44.     It was not unusual for RCSO officers to qualify slightly earlier for nighttime qualifications than 5 p.m. because they cannot receive overtime pay to come to the range after hours.

45.     Based on the incident at the shooting range, Plaintiff was placed on administrative leave in December 2023.  Plaintiff was charged with falsely stating that the qualification was a nighttime qualification when it was done during daylight

hours and for conduct unbecoming of an officer related to Plaintiff questioning the manner in which Deputy Beltran reprimanded her at the shooting range.

46.     These charges were false.  However, even if true, they would not have been brought against a Sheriff's Office employee with an impeccable record were it not for a retaliatory purpose.

*Gender Discrimination*

47.     Starting three years ago, Defendant Bianco and RCSO leadership denied Plaintiff promotions that were promised to her and for which she was the most qualified.  Four men received promotions ahead of Plaintiff.  The delay in promotion impacted Plaintiff's ability to move up the ranks to chief.  Subsequently, even though Plaintiff was highly qualified for a chief position, she was passed over by a less experienced male colleague who was one of the four men who had been promoted to captain ahead of her.

48.     In November 2022, RCSO Lieutenant Thomas Tanner attempted to further degrade Plaintiff by breaking into her office and placing multiple photos showing Sheriff Bianco winning the recent election throughout her office. Lieutenant Tanner, who had a history of treating women disparagingly, would not have acted similarly towards a male colleague.  Additionally, when Captain Flores reported the incident, it was not investigated.  Plaintiff's willingness to protest discriminatory treatment is one of the reasons she was retaliated against.

49.     RCSO has a known history of using derogatory terms to describe women.  Women are generally categorized as "bitches" or "sluts" and treated accordingly.  Whereas a male officer would be praised as a strong leader at RCSO, Plaintiff was categorized as a "bitch" for demonstrating the same leadership qualities as male leaders in the Department.  This classification was used by witnesses to impugn Plaintiff's character during the shooting range incident investigation.  A man in her position would not have been terminated. Plaintiff's male colleagues who were fired at the same time were the collateral damage of

1  RCSO leadership's actions against Plaintiff.

2  *Termination*

3      50.       Defendant Bianco used the shooting range incident as pretextual

4  justification for Plaintiff's termination.  In the termination letter dated April 26,

5  2024, Defendant Bianco noted he reviewed Flores's employment file covering the

6  previous five-year period and found not a single incidence of prior disciplinary

7  action.  Nevertheless, he proceeded to terminate her employment.

8      51.       Plaintiff was terminated from her position on July 11, 2024.

9      52.       Had Plaintiff been male and unquestioning of Defendant Bianco's

10  misconduct, a single disciplinary action over decades of service would not have led

11  to the termination of a respected twenty-eight-year veteran of the Sheriff's Office.

12      53.       At the time of her termination, Plaintiff was a Commander at the

13  Robert Presley Detention Center.

14      54.       On January 8, 2025, Plaintiff timely filed a claim against the County of

15  Riverside regarding her wrongful and retaliatory termination pursuant to Gov. Code

16  § 910.  The Riverside County Board of Supervisors denied the claim on January 14,

17  2025.

18      55.       On February 18, 2025, Plaintiff timely filed a complaint with the

19  California Civil Rights Department and received a right-to-sue notice.

20      56.       On March 11, 2025, Plaintiff timely filed a complaint with the EEOC.

21  To date, the EEOC has not issued a right-to-sue letter.  Plaintiff will amend her

22  complaint when she receives a right-to-sue letter or six months have passed.

23      57.       As a direct and proximate result of Defendants' actions, Ms. Flores

24  continues to suffer severe emotional injuries and medical expenses.  Her future

25  earning potential has been irreparably harmed by her removal from a government

26  position she held for nearly three decades.

27

28

1                                  **<u>FIRST CLAIM FOR RELIEF</u>**

2      **Retaliation in Violation of the Federal False Claims Act, 31 U.S.C. § 3730(h)**

3        58.      Plaintiff hereby realleges and incorporates each and every paragraph of

4  this Complaint.

5        59.      The Federal False Claims Act, 31 U.S.C. § 3730(h) Relief from

6  Retaliatory Actions reads as follows:

7                   (1) In general.  Any employee, contractor, or agent shall be entitled

8                      to all relief necessary to make that employee, contractor, or agent

9                      whole, if that employee, contractor, or agent is discharged,

10                    demoted, suspended, threatened, harassed, or in any other

11                    manner discriminated against in the terms and conditions of

12                    employment because of lawful acts done by the employee,

13                    contractor, agent or associated others in furtherance of an action

14                    under this section or other efforts to stop 1 or more violations of

15                    this subchapter

16                   (2) Relief.  Relief under paragraph (1) shall include reinstatement

17                      with the same seniority status that employee, contractor, or agent

18                    would have had but for the discrimination, 2 times the amount of

19                    back pay, interest on the back pay, and compensation for any

20                    special damages sustained as a result of the discrimination,

21                    including litigation costs and reasonable attorneys' fees.  An

22                    action under this subsection may be brought in the appropriate

23                    district court of the United States for the relief provided in this

24                    subsection.

25        60.      In retaliation for Plaintiff's complaints, Defendant criticized, berated,

26  and terminated Plaintiff.

27        61.      As a result of Defendant's actions, Plaintiff suffered general and special

28  damages, including lost wages and overtime compensation, earnings capacity and

promotional opportunities, other employment benefits, and emotional distress.

62.     Plaintiff also seeks to recover her attorneys' fees, costs of suit, and any other relief deemed appropriate by the Court.

## SECOND CLAIM FOR RELIEF

**Retaliation in Violation of California False Claims Act, Cal. Govt. Code § 12653**

63.     Plaintiff hereby realleges and incorporates each and every paragraph of this Complaint.

64.     At all relevant times, Plaintiff was employed by Defendant.

65.     At all relevant times, California Government Code Section 12651 was in full force and effect and was binding upon Defendant.  This section states that it shall be a violation of law for any person to "knowingly present or cause[] to be presented a false or fraudulent claim for payment or approval." Cal. Govt. Code § 12651(a)(1).

66.     At all times herein mentioned, California Government Code Section 12653 was in full force and effect and was binding upon Defendant.  Government Code Section 12653 subsection (a) provides that:

> An employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of his or her employment because of lawful acts done by the employee, contractor, agent or associate others in furtherance of an action under this section or other efforts to stop one or more violations of this article.

67.     Plaintiff personally observed and was informed that contract prices were being inappropriately inflated or charges, such as consulting fees, were listed in budgets without adequate explanations.

68.     Plaintiff also reasonably believed that RCSO was giving contracts to leadership's cronies without going through the required bidding process.

69.     Accordingly, Plaintiff had a reasonable suspicion and belief that employees of RCSO were defrauding the government.

70.     Plaintiff reported these violations on multiple occasions to supervisors in an effort to stop the violations.

71.     As a result of Plaintiff's efforts to prevent these violations, Defendants retaliated against Plaintiff by criticizing and berating her, performing no or only the most cursory investigation of Plaintiff's claims, and terminating Plaintiff under false pretenses.

72.     Plaintiff was harmed by being wrongfully terminated.

73.     As a result of Defendants' actions, Plaintiff suffered the loss of her salary and other wages, current and future earning capacity, the financial value of her employment benefits, and other pecuniary losses not presently ascertained.

74.     Plaintiff is entitled to two times her lost wages pursuant to Government Code Section 12653(c).

75.     As a further direct and legal result of the acts and conduct of Defendant, Plaintiff suffered and continues to suffer harm to reputation, embarrassment, humiliation, embarrassment, severe emotional distress, and mental anguish, in an amount according to proof.

76.     Plaintiff is informed and believes and thereon alleges that Defendants —some of whom are presently unknown to Plaintiff—committed the acts alleged herein: maliciously, fraudulently, and oppressively; with the wrongful intention of injuring Plaintiff; with an improper and evil motive amounting to malice or oppression; and in conscious disregard of Plaintiff's rights.  As such, Plaintiff is entitled to recover punitive damages from Defendant in an amount according to proof.

77.     As a result of Defendant's unlawful acts as alleged, Plaintiff is entitled

1  to compensation for special damages sustained due to Defendants' unlawful
2  retaliation.  Plaintiff is also entitled to litigation costs and reasonable attorneys' fees.

3

4                    **THIRD CLAIM FOR RELIEF**

5  **Wrongful Termination (Whistleblower Retaliation) in Violation of Cal. Labor**
6                          **Code § 1102.5**

7      78.      Plaintiff hereby realleges and incorporates each and every paragraph of
8  this Complaint.

9      79.      At all times relevant to this lawsuit, Plaintiff was an employee of
10 RCSO.

11     80.      In doing the things herein alleged, and as otherwise will be proven at
12 trial, Defendant violated California Labor Code Section 1102.5.

13     81.      California Labor Code Section1102.5 prohibits an employer from
14 retaliating against an employee because, *inter alia*, the employee:  (1) had
15 reasonable cause to believe that a violation of state or federal statute or local, state,
16 or federal rule or regulation occurred; and (2) disclosed—or may disclose—that
17 information to a person with authority either over the employee or to investigate,
18 discover, or correct the violation or noncompliance.

19     82.      As alleged herein, Plaintiff had reasonable cause to believe that
20 Defendants had violated Federal and State laws and regulations.

21     83.      Acting upon that reasonable belief, Plaintiff disclosed information
22 about these violations to her supervisor and others with authority to investigate
23 and/or correct RCSO's actions.

24     84.      Specifically, Plaintiff disclosed information to her immediate
25 supervisor and others about:

26              (1)     RCSO's unlawful up-charging in contracts
27              (2)     The unconstitutional use of excessive force in the Riverside
28 County detention system

1        (3)    A deputy's participation in conduct unbecoming of a law

2 enforcement officer.

3     85.    Defendant retaliated against Plaintiff by unlawfully terminating

4 Plaintiff for questioning these expenditures and incidents.

5     86.    By terminating Plaintiff, Defendant retaliated against Plaintiff in

6 violation of in violation of California Labor Code Sections 1102.5(a), 1102.5(b),

7 and 1102.5(c).

8     87.    As a direct and proximate cause of Defendant's conduct, Plaintiff has

9 suffered damages including, but not limited to, lost overtime pay, missed

10 opportunities for promotion and other employment benefits, loss of earnings and

11 future earning capacity, and other pecuniary loss not presently ascertained.

12     88.    As a further direct and legal result of the acts and conduct of

13 Defendant, Plaintiff has been caused to and did suffer and continues to suffer severe

14 emotional and mental distress, anguish, humiliation, embarrassment, fright, pain,

15 discomfort, and anxiety.

16     89.    Plaintiff is informed and believes and thereon alleges that Defendants

17 and their agents—some of whom are presently unknown to Plaintiff—committed the

18 acts alleged herein: maliciously, fraudulently, and oppressively; with the wrongful

19 intention of injuring Plaintiff; with an improper and evil motive amounting to malice

20 or oppression; and in conscious disregard of Plaintiff's rights. As such, Plaintiff is

21 entitled to recover punitive damages from Defendant in an amount according to

22 proof.

23     90.    Plaintiff is also entitled to litigation costs, reasonable attorney's fees,

24 and costs of suit.

25

26

27

28

**FOURTH CLAIM FOR RELIEF**

**Wrongful Termination in Violation of Public Policy**

91.      Plaintiff hereby realleges and incorporates each and every paragraph of this Complaint.

92.      RCSO terminated Plaintiff because she sought to stop and prevent unlawful activity and because of her gender.  Defendant's termination of Plaintiff for these reasons violated important and well-established public policies, including the public policies codified in California Labor Code Section 1102.5 and California Government Code Section 12940.

93.      At all times during her employment with RCSO, Plaintiff performed her duties in an exemplary fashion.  By reason of the aforementioned conduct and circumstances, Defendant violated the fundamental public policies of the State of California.

94.      Plaintiff is informed and believes and thereon alleges that Defendants' termination of her employment, as alleged herein, was based on illegal motivations set forth above and that any other reasons proffered by Defendants were and are pretextual.  The aforementioned harassment, wrongful termination, and retaliation have resulted in damage and injury to Plaintiff as alleged herein.

95.      As a direct, foreseeable, and legal result of Defendant's actions, Plaintiff has incurred and continues to incur substantial losses in earnings, earning capacity, and employment benefits.

96.      As a direct, foreseeable, and legal result of Defendant's actions, Plaintiff has suffered and continues to suffer damage to her reputation, humiliation, embarrassment, mental and emotional distress, and mental anguish, the precise amount of which will be proven at trial.

97.      Plaintiff is informed and believes, and thereon alleges that Defendant and its managing agents, officers, and/or directors—some of whom are presently unknown to Plaintiff—committed the acts alleged herein maliciously, fraudulently,

and oppressively; with the wrongful intention of injuring Plaintiff; with an improper and evil motive amounting to malice or oppression; and in conscious disregard of Plaintiff's rights. As such, Plaintiff is entitled to recover punitive damages from Defendant in an amount according to proof.

98.     As a result of Defendants' retaliatory acts as alleged herein, Plaintiff is entitled to reasonable attorneys' fees and costs of suit.

### FIFTH CLAIM FOR RELIEF

### Gender Discrimination in Violation of FEHA, Cal. Gov't Code § 12940(a)

99.     Plaintiff hereby realleges and incorporates each and every paragraph of this Complaint.

100.     Plaintiff filed a complaint with the Civil Rights Department of California alleging that Defendant discriminated against her on the basis of gender and marital status in violation of Cal. Gov't Code § 12940(a), and Plaintiff received a right-to-sue notice. Plaintiff then timely filed this action.

101.     In violation of Government Code section 12940(a), Defendant unlawfully and willfully discriminated against Plaintiff by terminating her in part based on her gender.

102.     RCSO, which was Plaintiff's employer, terminated Plaintiff.

103.     Plaintiff was harmed by Defendant's termination of Plaintiff's employment, both financially and emotionally.

104.     Indeed, by the aforesaid acts and omissions of Defendant, Plaintiff has been directly and legally caused to suffer actual damages including, but not limited to, loss of her salary, loss of current and future earning capacity, loss of the financial value of her employment benefits, and other pecuniary loss not presently ascertained.

105.     As a further direct and legal result of the acts and conduct of Defendants, Plaintiff has been caused to suffer and continues to suffer emotional

and mental distress, anguish, humiliation, embarrassment, fright, shock, pain, discomfort, and anxiety.  The exact nature, duration, and extent of said injuries are presently unknown to Plaintiff, but she is informed and believes and thereon alleges that some, if not all, the injuries are reasonably certain to be permanent.

106.    Defendant's conduct in terminating Plaintiff because of her gender— was a substantial factor in causing Plaintiff's harm.

107.    Defendant—independently and through its officers and agents—acted with oppression, fraud, or malice in terminating Plaintiff so as to support the imposition of exemplary damages.  Sheriff Bianco and RCSO employees engaged in despicable conduct towards Plaintiff with a willful and conscious disregard of her rights under the FEHA.

108.    As a result of Defendant's discriminatory conduct alleged herein, Plaintiff is entitled to reasonable attorney's fees and costs.

**SIXTH CLAIM FOR RELIEF**

**Conspiracy to Interfere with Civil Rights, 42 U.S.C. § 1985**

109.    Plaintiff hereby alleges and incorporates each and every paragraph of the Complaint.

110.    Defendant Bianco conspired with others to deprive Plaintiff of her constitutional rights, motivated by discriminatory animus towards women and retaliatory intent.

111.    Defendant Bianco encouraged or allowed members of his staff to use derogatory language classifying women, including Plaintiff, as bitches; to vandalize Plaintiff's office; and to humiliate Plaintiff in front of others without repercussions.

112.    Defendant Bianco's actions were part of a concerted effort to harm Plaintiff and violate her rights.

113.    As a direct and proximate result of Defendant Bianco's actions, Plaintiff has suffered damages, including emotional distress and economic harm.

**SEVENTH CLAIM FOR RELIEF**

**Violation of Civil Rights 42 U.S.C. § 1983**

**(Fourteenth Amendment Due Process)**

114.     Plaintiff hereby alleges and incorporates each and every paragraph of the Complaint.

115.     Defendants, acting under color of state law, deprived Plaintiff of her constitutional rights, including her right to due process under the Fourteenth Amendment.

116.     Defendants deprived Plaintiff of her right to a good reputation, a protected liberty interest.  Defendants intentionally stigmatized her and impaired her reputation for honesty and morality by asserting that Captain Flores was fired for dishonesty, thereby hindering future employment opportunities.

117.     Defendant Bianco and his leadership staff conspired to keep Plaintiff uninformed.

118.     Defendants' actions were intentional, malicious, and in reckless disregard of Plaintiff's constitutional rights

119.     As a direct and proximate result of Defendants' actions, Plaintiff has suffered damages, including emotional distress and economic harm.

**EIGHTH CAUSE OF ACTION**

**Violation of Civil Rights 42 U.S.C. § 1983 (Monell)**

120.     Plaintiff hereby realleges and incorporates each and every paragraph of this Complaint.

121.     Defendant COUNTY, through its policies, practices and customs, failed to adequately train, supervise, or discipline its employees, including those in the Riverside County Sheriff's Office.

122.     Moreover, Defendant Biano was the policy maker for the Sheriff's Department at all relevant times, and he directed or ratified the retaliation against plaintiff and other Sheriff's Department employees, including retaliation against

employees who report irregularities in the contracting process, inflated charges for services to the department, and unconstitutional treatment of inmates housed in the County's detention centers.  Defendants Bianco and Riverside County also failed to discipline employees who committed these violations.  Instead, the RCSO leadership team, including Defendants Bianco, Sharp and Lopez, used threats, forced resignations, and terminations to silence employees who voiced concern or opposition regarding these corrupt and illegal practices.

123.     The County's failure to correct or stop these practices resulted in the violation of Plaintiff's constitutional rights, including her right to due process under the Fourteenth Amendment.

124.     As a direct and proximate result of Defendant Bianco and Riverside County's actions, Plaintiff has suffered damages, including emotional distress and economic harm.  Based upon the principles set forth in *Monell v New York City Department of Social Services*, 436 U.S. 658 (1978), Defendant County is liable for Plaintiff's injuries as set forth herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests relief against Defendants, and each of them, as follows:

1.   For general damages in a sum which will be shown according to proof;
2.   Special damages;
3.   For compensatory and consequential damages according to proof;
4.   For interest on the amount of losses incurred;
5.   For loss of earnings and other economic expenses according to proof;
6.   For all damages and remedies available for violation of 31 U.S.C.S. § 3730, including but not limited to reinstatement with the same seniority status that employee would have had but for the discrimination, two times the amount of back pay, interest on the back pay, and compensation for

any special damages sustained as the result of the discrimination, including litigation costs and reasonable attorneys' fees.

7. For all damages and remedies available for violation of Government Code § 12653(a)-(b) *et seq.*, including but not limited to, double back pay, interest, attorney's fees and litigation costs and reinstatement with full seniority pursuant to Government Code § 12653(b);

8. For all damages and remedies available for violations of Labor Code Section 1102.5, including, without limitation, attorney's fees and costs.

9. For costs of suit, including reasonable attorney's fees, including under 42 U.S.C. § 1988;

10. For punitive and exemplary damages as permitted by law;

11. For such other and further relief as the Court may deem proper.


DATED: July 7, 2025                    SCHONBRUN SEPLOW HARRIS
                                       HOFFMAN & ZELDES LLP

                                            */s/ Paul Hoffman*
                                       By: _____
                                            Paul Hoffman
                                            John Washington
                                            Karen Kartun
                                            Attorneys for Plaintiff

1

### **DEMAND FOR JURY TRIAL**

2

Plaintiff hereby demands trial by jury for all causes of action alleged.

3

4  DATED: July 7, 2025                SCHONBRUN SEPLOW HARRIS
                                      HOFFMAN & ZELDES LLP
5

6                                     */s/ Paul Hoffman*
                                 By: _____
7                                     Paul Hoffman
8                                     John Washington
                                      Karen Kartun
9                                     Attorneys for Plaintiff

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28